Isaac, would you call the first case, please? Will the parties presenting arguments today please approach the bench, introduce yourselves. If you could spell your last names for the record. Good morning, your honors. I'm David Harris, H-A-R-R-I-S, on behalf of the appellant Everett Harris. Good morning. Good morning, your honors. Brenda Gibbs, G-I-B-B-S, on behalf of the people. Okay. Good morning to both of you. We are going to try to stick as best we can to a 15 and 15 allocation of time. Mr. Harris, I assume you'd like to reserve a few minutes for rebuttal? Yes, I would. And we'll make sure you get your chance to say what you need to say. We'll try not to be too strict, but generally keep to this. Keep in mind, please, that that microphone is not for amplification. It's just to record, so please keep your voices up. And with that, Mr. Harris, you have the floor. Thank you. And may it please the court, there are two substantive issues in this case, and I'd like to address both of them today, beginning with the prosecutor's closing argument and then addressing the sufficiency of the evidence of aggravated vehicular hijacking. The outcome of this case turned on Samantha Santos's credibility, and specifically the question of whether my client, who was listed as the father of her children on school forums, who she considered a father during the on periods of the on and off relationship, knowingly lacked consent to drive her kids away when she got out of the car they were all in, hung up on him when he immediately called her to ask why she got out of the car and refused to answer several of his calls over the following hours. The jury struggled with this case, spending more than 20 hours over two long days of deliberations, specifically asking to see transcripts of Samantha Santos's testimony, twice saying they were deadlocked, including hopelessly deadlocked. Perhaps sensing the closeness of this evidence, the prosecutor finished her closing argument with a strictly emotional plea to the jury, asking them to issue guilty verdicts to recompense Santos and her friends and family for the supposed permanent psychological trauma they were suffering, and then they went again in rebuttal, hinting at other bad acts my client had done in the past. Now first, this emotional appeal. The prosecutor made her closing pitch to the jury, saying that Santos acted to protect her kids, and then noted they all survived but their lives will never be the same. Never. The prosecutor said they'll never sleep the same at night and they'll never part with their kids with any sense of security or peace that many people take for granted. This argument had nothing to do with the question before the jury. It had everything to do with engendering sympathy and compassion for Santos and her family and seeking some sort of compensation of a guilty verdict. The prosecutor then closed by saying there is something you can give them, and that's justice and a guilty verdict. Can there be a reasonable inference from the actual evidence? This type of permanent psychological? Well, can attorneys argue something that one could reasonably infer from the evidence that was actually presented? Yes, attorneys are allowed to argue reasonable inferences from the evidence. All right. Well, what about these little kids in the car, and what about the mother leaving them in the car with this man, and then, you know, she thought that he was going to stop and, you know, get the kids out and everything would be fine, but they were actually transported quite a ways, right? They were, yes, driven away when she got out of the car. I mean, it's kind of a horrific sort of setting for a mother and her children, so are you saying that they crossed the line, that this wasn't reasonable to infer that they'd probably never be the same or she would never want to feel leaving her kids anywhere ever again? Absolutely. I think there are actually two responses to that. First, I don't think it's a reasonable inference to say this is some permanent. The prosecutor repeated never. They'll never do this. They'll never sleep well at night. They'll never part with kids with any sense of security, and there's no indication that even by the time of trial two years later, she can't leave kids with friends or families or boyfriends or loved ones with any sense of security, let alone that this will last for the rest of her life, or that the kids can't sleep well at night. I don't think it's even reasonable to infer that a 4-year-old would have a permanent memory of something like this. And second, even if it is an inference one could make, it is not an appropriate argument to the jury because it does not bear on the question of whether my client committed the elements of these crimes. Whether these people are going to have psychological trauma for decades into the future does not help the jury answer the question before it of whether he committed these crimes, whether he was not committing kidnapping and therefore was able to use justified self-defense. You're not contesting, though, the sufficiency of the kidnapping or the attempt? What was the finding? Did the attempt murder get reduced to the? There was two attempt murders, aggravated kidnapping of both kids, aggravated vehicular hijacking, aggravated discharge of a firearm. We're not challenging the sufficiency of the evidence, but that's a separate question than whether the evidence is closely balanced for plain air purposes as we're arguing here. Yeah. Because, of course, we're not. That's a separate question of whether any rational juror could have found guilt as opposed to here, whether the evidence was close, whether it turned on credibility, whether it could only. Was it close on the attempt murder and the aggravated kidnapping? I'm sorry? Was it close on the attempt murder or aggravated kidnapping? On at least several of the cases, yes. Well, the defense theory was that my client did not lack consent to drive these kids. If he doesn't lack consent, he's not committing kidnapping. If he's not committing kidnapping, he's allowed to justifiably use force to defend himself against this hammer attack that took place in the parking lot, which so the consent really impacted the entire case. Okay. And so this emotional pitch to the jury had nothing to do with guilt and should be condemned by this court. It also wasn't based on any evidence or, I believe, a reasonable inference. And then the prosecutor played another trick in rebuttal, hinting that he'd committed bad acts in the past, that she's known him for 10 years, she knows what he's capable of, and that's why she got out of the car. And the only reasonable inference is that she knows he's capable of some sort of violence during this relationship. Didn't they argue, though, that this was a response to something that was made in the defense closing? The defense closing, yes, they have argued that. What was the argument that they said they were responding to? I believe it was just that she got out of the car for some of the reasons she gave for getting out of the car weren't the way she said it, that she wasn't credible, and then she was stuck in a situation trying to explain to her family why this on and off, temporarily at that point, I guess, off boyfriend had her kids and made up this story, pointing again to how she made up a story to the police officer about getting hit. Didn't she testify that she got out of the car because she didn't want to have a fight with him in the car? She didn't want to fight in front of the kids, yes. Okay. Could that comment have been related to that, that, you know, that over the years there might have been some fights? Well, that's the thing. She never indicated that there had been any fights. She just didn't want to fight in front of her kids. Okay. And then this cryptic comment, she knows him for 10 years, she knows what he's capable of, does suggest these other bad acts that weren't proven. Okay. Fair enough. Yes. But the defense argued that Santos chose to willingly exit the car. Yes. So what is the state supposed to do when that argument is made? They can rely on her testimony that she got out of the car because she didn't want this fight to continue or escalate in front of the kids. They cannot suggest that this history of 10 years of a relationship includes violence. And when there's no evidence, no. You're reading something into that. I think it's the only reasonable reading of she knows what he's capable of. And the state in its brief said, well, he's capable of taking the car keys out and throwing the car in the park, which is. . . Did he throw it at her in the car? Hmm? Didn't he throw something at her in the car? I think there was some possible testimony about the phone. Yeah. Well, I think there was testimony that he threw the phone at her. Yeah. I can't remember if. . . I'm going to show you how crazy I can be. He took his phone to look at it and threw it. I think she said she threw it at him. But these comments had no place in this trial. They did not bear on his guilt or innocence. And it affected this close case. The jury deliberated, like I said, for 20 hours or more than 20 hours. They asked for Samantha Santos' transcript, eventually all the transcripts. They said they were hopelessly deadlocked and returned the verdict. Well, there was testimony. I mean, I think that this might be a little different than your ordinary case, you know, in terms of deliberating. Because she started hitting him with a hammer, right? Yes. Yeah, because she. . . her kids were, you know, taken away in a car. And she thought for sure that he was just going to stop this thing. It would end peacefully. And that would be the end of it. So, I mean, I don't know how many parents, you know, may not or would react the way she did. But, you know, there are a lot of parents that would have, you know, taken a hammer. And, I mean, you know, their kids were. . . This was a kind of a long-gated sort of thing, wasn't it? It was over a few hours. Yeah, I mean. . . Yeah. So I think the jury probably had a lot to chew on. Well, sure, they did. There was a lot of evidence to go over. But Samantha's credibility was called into question by several contradictions noted in the briefs, most notably that she either lied to the jury or to the police when the police officer who first responded to her call noted that she claimed he hit her with a closed fist numerous times in the car but noted no injuries. She sought no medical treatment in that trial. She said he didn't hit her at all. Some other contradictions, like how she said she . . . they never made it to the first mall that they went to look for because she talked to the kids and learned they were at Harlem and Irving Plaza. But Gerardo, who was driving the van with her, said, we actually went to that parking lot, drove around looking for her car. How long were the police and she, in terms of actual time, looking for these children? It appears it was somewhere . . . She picked him up in the morning sometime around 9 or 10, I believe, and the incident at the mall was around 1. In the meantime, she went back to her house. There was different contradictory testimony from different witnesses about whether it was before lunch, after lunch, inside, outside, whether she went upstairs or when the father came home, things like that, and rounded up this posse to go out on the hunt. And the defense theory, again, was that this all hinged on consent, and if he didn't knowingly lack consent, he wouldn't be committing kidnapping and he could use justifiably used force to defend himself from a hammer attack. I would also note that Samantha said that this relationship was on and off by the day, around that month of November 2014, by the day. And when the relationship was on, she said she considered him a father to the kids. And so the question of whether he could knowingly be aware that he lacks consent when day by day he might be considered a father and might not is a close one. And in a close case like this that depends on her credibility and with all these contradictions, these comments could have tipped the scales against my client and he should get a new trial for these errors. Separately, the evidence of aggravated vehicular hijacking was insufficient, both because it did not show that he took the van from Ephraim, Toronto, from his immediate presence, and because it didn't show he took it by force. Now, the legislative comments surrounding the adoption of the aggravated vehicular hijacking statute show that this is intended to address people being forcibly removed or forcibly separated from their car or yanked out, as was repeatedly said by the sponsor, Senator Hawkinson. And the legislature also made it more restrictive than robbery regarding the presence element. Robbery is just from the mere presence of someone. The legislature added the term immediate as a modifier, and courts have to give effect to these legislative choices of language. And the facts, like you said, were wild. He was in the parking lot. He was attacked with a hammer before he even got out of a car and fired a shot, as the prosecutor argued, at Santos and missed and hit Tirado, who fled into the mall, and then returned. It was about six or seven parked cars away when my client hopped in his van to escape. He kept the motor running, and it indicated that he intended to continue using the vehicle. I don't think it indicates that intent. I think it indicates the rapidity with which he and Santos blocked the car and immediately got out to attack my client. Also, there's no indication, the distance, this immediate presence, six or seven car lengths away is more than cases the state cited, is more than a reversal in this case in Crooksy. But beyond the immediate presence, there was also no indication that it was taken by force, as the legislature had contemplated regarding a forcible separation from a car. Tirado and Santos were the ones who got out of the car to quickly attack my client. His force was defensive. Even if the jury ultimately found he wasn't able to use that as a legal justification, it was still a defensive act against a hammer attack, not in any way connected to trying to take a car. And there's no indication he was even aware that this van was behind him at the time he fired a gunshot. They ran to the door before he even got out of the driver's seat. They opened it. They tried to yank him out, and Samantha was hitting him with a hammer when he took a gun from the panel of the car and fired it. And so this force, there's simply insufficient evidence to show that this force was sufficiently connected or had a sufficient concurrence with the later taking of the van that Tirado had actually gotten out to attack my client and instigate that violence. Mr. Harris, I think we're running up against the time here. Do you want to? We'll give you a few minutes for recall. Yes, thank you. Ms. Gibbs. Thank you. May it please the Court, Brenda Gibbs, Assistant State's Attorney on behalf of the people. Beginning with the issue of the prosecutor's comments, I would like to clear up some discussion about consent. Even if defendant had consent when she got out of the car, that consent was revoked when she told him to bring her children back, and she did that on the phone. She said, take them to your mother's house, bring them to me, take them to my house. Where are you with my children? And his response was, I'll trade the children for you. So even if there was consent, which she denied, even if there was, it was revoked. So he did not have permission to take those children. In terms of the comments in closing arguments, the first set of comments regarding the sleep and the effect that this had on the victims was not what the jury was left with. At the end of the rebuttal argument, the prosecutor said, I'm sorry, she asked the jury to find defendant guilty for every bullet he put in Samantha and for every minute that he had her children from her. So that was not leaving the jury with last thoughts of their sleeplessness or her insecurity about leaving the children. That was one sentence during opening and close. There was a lengthy closing by counsel, and then the rebuttal was also lengthy. So that was not the last comment that the jury heard. But was it proper to say that, that they'll never sleep the same at night, they'll never part from their children again with a sense of security or peace of mind? Does that have anything to do with the facts of this case? The facts, not necessarily. But prosecutors are allowed to make comments in closing that are talking about the evils of crime and the effects of crime on people. And as Justice McBride noted, it's not unheard of that persons who go through a traumatic event such as this, having your children being taken from you for three hours and not knowing where they are, being shot at by someone whom you've known for ten years and have been dating, that can cause an effect. That can reasonably impact your sleep. And these are matters of general knowledge and matters of common sense in terms of jurors and laypersons and ourselves. What does that have to do with whether the defendant committed these crimes? Again, these comments were in the message and intended to convey the message that crime affects victims and that it has a lasting impact on them. So again, it's not directly based on the testimony, but it's a reasonable inference from the circumstances that occurred here based on human experience. The second set of comments, that Samantha got out of the car because she knew what he was capable of, that was in response to defense counsel's closing argument. He implied in closing that she got out of the car voluntarily and that her reasons for getting out were irrational. But Samantha had testified that he had taken control of her car by putting it in park, taking the keys, ordering her out, and when she refused, he got out and pushed her out of the driver's seat and drove off in the car. And she explained that she got out of the car because she was scared and did not want the situation to escalate. She said, I did not want him to fight me in front of my children. And the prosecutor's rebuttal, she said, she got out because she knew the defendant. She had known him for ten years and knew what he was capable of. And that was not about crimes or bad acts. Samantha testified that she knew him for ten years. She dated him within the past two years of this incident on and off. And when you are interacting with somebody on that level for that length of time, you have knowledge of their personality, their disposition, their actions and reactions. You have knowledge if they're quick to anger. And so she had that knowledge, not based on his prior crimes, based on her experience in interacting with him over this length of time. And also based on what happened when he got in her car that morning. He was angry because she hadn't called him back the night before. He kept demanding to talk about their relationship. He threw her phone at her. She was watching the situation escalate, and she didn't want it to get to a certain point in front of her children. And that was all that that remark was about. Turning to the first issue, the statute requires a defendant to take a vehicle by force from the immediate presence while armed with a firearm. And we have all that here. Defendant used force against Ephraim when he shot him in the testicles while he and Ephraim were within feet of Ephraim's van. Defendant shot to the testicles, caused Ephraim to run for his life and get help. And defendant was still shooting as Ephraim was returning with help. And then he stopped shooting and got in the van and took off. The statute does not require the force to occur simultaneously with the taking, does not require the taking to immediately follow the force, and does not require the force to be used for the express purpose of the taking. There need only be some concurrence between the force and the taking. And that concurrence exists when the force and the taking are part of a series of continuous acts. Isn't that the way the legislation – I'm sorry, that precedent has clearly already established that with robbery, when they describe how the force can occur concurrent with a series of acts? Yes, Your Honor. That was described in Strickland and that was followed in Aguilar, which was a vehicular hijacking case. Now here, there was a sufficient concurrence between the force and the taking because defendant's shooting of Ephraim, chasing and shooting of Samantha, and taking of the van occurred in an uninterrupted sequence of events over a brief period of time, during which defendant took advantage of his shot to Ephraim by taking the car after Ephraim fled. The immediate presence element has to do with the danger to a victim who is in, at, or near his vehicle. And we know this from Senator Hawkinson's comments during legislative debates where he said you could be smashed from your car, you could be accosted while pumping gas, or while repairing your car. We also know this from people v. Aguilar and people v. Ricardo A., in which the courts found that there was vehicular hijacking where those victims exited their cars, were attacked by the defendants, fled the attack, and then the defendants got in their cars and drove away. We also know this from Cooksey, McGee, and Robinson, all in which the victims were not near their car where they were accosted, were not near their car when force was used against them, and were not ever in the immediate presence of their vehicle with the defendant. By contrast here, Ephraim was within feet of his van when defendants shot him. Defendant thus took the van from Ephraim's presence by shooting him and causing him to run. And the fact that Ephraim had the presence of mind and the physical ability to run does not negate the fact that there was immediate presence when he was shot. And the fact that he had the ability to run also does not reduce defendants' culpability for taking that van. The immediate presence was connected to the taking and the force because defendants' use of force in the immediate presence of the van caused Ephraim to flee, and after he fled, defendant took the van. The statute does not require a synchronization of the taking, the force, and the immediate presence, and this court should not interpret it as doing so because defendants should not be rewarded and society penalized for Ephraim's interest in self-preservation. Imposing a limit on how far a gunshot victim can flee from his vehicle before the shooter is no longer legally responsible for taking the car is irrational and unjust. Given the greater risk of harm to a gunshot victim who remains in the presence of his car with an active shooter, it's not reasonable to think that the legislature wanted this statute to only apply when a victim who flees doesn't flee beyond a certain radius of his car. If it had intended that, it would have written that into the statute. As it stands, defendant's conduct clearly constituted aggravated vehicular hijacking. He shot Ephraim in the immediate presence of a car. He fired his gun five more times, and then he took Ephraim's van. There was force in the immediate presence of the vehicle, and there was a taking, all while defendant was armed with a firearm. If there are no further questions from the court, we would ask you to affirm the defendant's convictions. All right, counsel, thank you very much. Mr. Harris? Yes, I'll be brief and just kind of in reverse order here, starting with vehicular hijacking. There was actually no evidence how close he was parked to Samantha Santos' car where the defendant was in it and to the driver's door of it, so we don't even know how close the car was when he got shot. And even if it was in the immediate presence, still not a taking by force, I know the counsel mentioned some older cases, including Aguilar, which said it was the first case to address the vehicular hijacking statute. But even since Aguilar still required a sufficient concurrence, and since then there have been a couple of cases, this court later in Cackler in 2000 said that there was no evidence that the force was used in order to obtain the property, so it's about using force to take the property. Well, if the victim had been shot in the head and fell dead right there and the defendant then took the car, would that be sufficient in your view? For the immediate presence or the force question? The force. The force? No, because I don't think the force was sufficiently related to taking the van. There was no indication that Everett Harris even knew that there was a van there when he used force to defend himself against a hammer attack and inadvertently struck Tirado. And so there was just not a sufficient concurrence between this force and subsequently taking the van. Even the trial court commented that this was a separate course of conduct. Taking the van was a separate course of conduct from the attempted murders. I believe the court thought it had to make this finding to get consecutive sentences, which was the case under old law. At the time the court didn't need to do that, but the court did. So the force has to be for the purpose of taking the vehicle. It can't just be that after you commit deadly force or great bodily harm of some kind that you get this new idea to take the car. It has to be for the purpose of taking the car. That's how this Court described it in Cackler, that there was no evidence that the force was used in order to obtain the property. Some other cases use broader language. What about Strickland? Strickland, a robbery case from the 80s, said that it could be developed afterward. Yeah. Is there anything that would suggest to us that Strickland is no longer the law in Illinois? I think, again, the subsequent cases, even interpreting the statute, like Cackler, Runge, and the Third District, that said the force wasn't used as a means of acquiring, there has to be a relation between the force. And here there wasn't, especially because the force was defensive. It wasn't like my client began committing acts against Tirado that led to the taking of the car. He began defending himself from a hammer attack and then took the car. Well, Tirado didn't have any hammer. He was right there with Santos. Right. Did he ever have a hammer in his hands? No. Okay. No. And the evidence seemed to indicate, and the prosecutor below argued to the jury, that the bullet was intended for Santos. He was shooting Santos and missed and hit Tirado. If there's any indication that the courts, including the Illinois Supreme Court, has moved away from reading vehicular hijacking and robbery similar, there's a recent decision in People v. Reese in the Illinois Supreme Court that did examine the taking language, not force, not immediate presence, but the taking, that taking property for robbery requires physical dispossession, and the court moved away from that and said we're not going to require that for vehicular hijacking. Sure, but they didn't discuss the force and whether or not concurrence means. No. They haven't really ever backed off that that I'm aware of. Well, it just shows there's not a perfect overlap between these two statutes. Sure. Especially with the presence element being more restrictive here. As for the closing argument, well, it wasn't the final words the jury heard. It was the final pitch of the opening close. The final stanza said to the jury was about this lasting, unproven, but lifelong emotional trauma, and about consent, whether he may have had consent or not known he lacked consent when he drove away, but that it was later revoked. That really just turns on her credibility, again, whether she's believable that she revoked consent over the course of these couple hours or whether she was instead trying to cover for why her kids were with this person her family might not have thought she was in a relationship with. If there are no further questions, I'd ask that this court reverse the demand for a new trial. All right, counsel. Thank you very much, both of you, for your presentation, for your very good briefs. We'll take the matter under advisement, and thank you all. We will move on.